## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANAND ROY, derivatively on behalf of ADOBE INC., | Case No.: |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| SHANTANU NARAYEN, JOHN MURPHY, DANIEL DURN, DAVID WADHWANI, JONATHAN VAAS, AMY BANSE, BRETT BIGGS, MELANIE BOULDEN, FRANK CALDERONI, LAURA DESMOND, SPENCER NEUMANN, KATHLEEN OBERG, DHEERAJ PANDEY, DAVID RICKS, and DANIEL ROSENSWEIG, | |
| Defendants, | |
| and | |
| ADOBE INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Anand Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Adobe Inc. ("Adobe" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Amy Banse ("Banse"), Brett Biggs ("Biggs"), Melanie Boulden ("Boulden"), Frank Calderoni ("Calderoni"), Laura Desmond ("Desmond"), Daniel Durn ("Durn"), John Murphy ("Murphy"), Shantanu Narayen ("Narayen"), Spencer Neumann ("Neumann"), Kathleen Oberg ("Oberg"), Dheeraj Pandey ("Pandey"), David

Ricks ("Ricks"), Daniel Rosensweig ("Rosensweig"), Jonathan Vaas ("Vaas"), and David Wadhwani ("Wadhwani") (collectively, the "Individual Defendants," and together with Adobe, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Adobe, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Adobe, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from July 23, 2021 through September 15, 2022, inclusive (the "Relevant Period").

2.      Adobe is a Delaware-incorporated software technology company based in California that offers a number of applications and services for various uses in design, as well as document, video, and photo editing. The Company's operations primarily exist on a subscription model, with Adobe selling access to its applications for a monthly fee, in addition to offering

cloud-based "software-as-a-service" subscriptions.

3.     During the Relevant Period, Defendants continuously downplayed competition facing Adobe from companies such as Figma, which provides a web application for creating user interfaces. Indeed, Figma was proving to have growing successes, reaching a $10 billion valuation just prior to the start of the Relevant Period. Defendants downplayed the threat Figma presented to Adobe's market position, calling Figma a "point solution provider" and a "single product compan[y] that[] found a niche with a growing universe of users[,]" instead of admitting Figma was a major competitor of Adobe. Defendants further represented that Figma's customers would eventually switch to the Company's more advanced products. In particular, Defendants misleadingly suggested that Adobe's existing offerings, including its "Express" application, were adequate to counter any harms the Company may have otherwise faced due to Figma's growing market position. The Company also concealed that its own user-interface design app, "XD," was failing to gain traction with customers.

4.     The truth emerged on September 15, 2022, when the Company announced that it would acquire Figma for $20 billion - double Figma's valuation from just one year prior and at a multiple of 50 times Figma's revenues, revealing for the first time that Defendants viewed Figma as not only a serious competitor, but as an existential threat to Adobe, and further revealing that the Company's own in-house products were failing to adequately serve their intended purposes.

5.     On this news, the price of Adobe stock fell $62.39 per share, or nearly 17%, from a closing price of $371.52 per share on September 14, 2022, to close at $309.13 on September 15, 2022. That drop caused the Company's market capitalization to fall by a massive $28.9 billion.

6.     The U.K.'s Competition & Markets Authority (the "CMA") later issued a report on August 7, 2023, confirming that Adobe viewed Figma as a competitive threat throughout the

Relevant Period and that at the same time its own user-interface design product was a failure. Specifically, the report indicated that Figma competes directly with Adobe XD (not Express), is a clear market leader in design software, and is several times larger than any other supplier of "all-in-one" screen design software. The report also found that Adobe shifted resources out of XD in favor of a new tool that, according to internal documents, encompassed a range of functionalities designed to compete directly with Figma and that Adobe had a large team of engineers working on the development of this tool until it was cancelled shortly before the announcement of the merger. Further, the CMA report shows that Adobe's efforts in product-development were motivated, at least in part, by a desire to compete with Figma. In that vein, the report noted that "Adobe's internal documents regularly reference competing with Figma and compare planned features to those offered by Figma." As a result, the CMA determined Adobe and Figma to be "close competitors" in all-in-one screen design and that this competition would be lost as a result of the merger.

7.      On December 18, 2023, Adobe and Figma mutually agreed to terminate their $20 billion merger deal, after they concluded that there was "no clear path" to receive necessary regulatory approvals from the European Commission and the UK Competition and Markets Authority.

8.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (a) Figma was establishing a leadership role in user experience design and growing its market share; (b)

4

Adobe and Figma were in direct competition with regard to user experience design; (c) the Company's "Express" product was not an effective counter to Figma's growing market share in bringing new customers to the Company's paid offerings; (d) the Company's other offerings were failing to successfully compete with Figma on user experience design; and (e) the Company was losing market share to Figma. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

9.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, one of the Individual Defendants sold Company shares at inflated prices.

10.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11.      In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Adobe to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between July 2021 and September 2022, approximately 9.3 million shares of Adobe common stock were repurchased, costing the Company almost *$4.5 billion.* As the Company's stock was actually worth only $309.13 per share, the price at which it was trading when markets closed on September 15, 2022, the Company overpaid for repurchases of its own stock by almost *$1.6 billion* in total.

12.      In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and various of the other Individual Defendants named herein to a federal securities fraud class action lawsuit

pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, losses due to the repurchases the Individual Defendants caused the Company to make while the Company's stock price was artificially inflated due to the misrepresentations alleged herein, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein— the Company will have to expend many millions of dollars.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of various of the Individual Defendants' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), 78t(a) and 78t-1), Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder.

16.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Adobe. Plaintiff has continuously held Adobe common stock at all relevant times. Plaintiff is a citizen of Texas.

### Nominal Defendant Adobe

23.     Adobe is a Delaware corporation with its principal executive offices at 345 Park Avenue, San Jose, CA, 95110-2704. Adobe shares trade on the NASDAQ under the ticker symbol "ADBE."

**Defendant Banse**

24.     Defendant Banse has served as a Company director since 2012. She also serves as Chair of the Executive Compensation Committee and as a member of the Governance and Sustainability Committee. According to the proxy statement that the Company filed with the SEC on March 3, 2023 (the "2023 Proxy Statement"), as of February 21, 2023, Defendant Banse beneficially owned 32,699 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Banse owned approximately $11.3 million worth of Adobe stock.

25.     For the fiscal year ended December 2, 2022 (the "2022 Fiscal Year"), Defendant Banse received $382,536 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $282,536 in stock awards. For the fiscal year ended December 3, 2021 (the "2021 Fiscal Year"), Defendant Banse received $416,239 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $316,239 in stock awards.

26.     The 2023 Proxy Statement stated the following about Defendant Banse:

Ms. Banse is currently a partner at Mastry, Inc., an early-stage venture capital firm. Previously, she held several roles at Comcast Corporation ("Comcast"), a global media and technology company, including Executive Vice President, Comcast Corporation, and Managing Director and Head of Funds, Comcast Ventures. Prior to that role, Ms. Banse was President of Comcast Interactive Media ("CIM"), a division of Comcast responsible for developing Comcast's online strategy and operating Comcast's digital properties, including Xfinity.com and Xfinitytv.com. She joined Comcast in 1991 and spent the early part of her career at Comcast overseeing the development of Comcast's cable network portfolio. She received a B.A. from Harvard and a JD from Temple University School of Law.

As the former Managing Director and Head of Funds for Comcast Ventures and

Executive Vice President, Comcast Corporation, as well as her prior executive positions, including President of CIM, Ms. Banse has extensive executive leadership experience and extensive knowledge of financial and strategic issues. She also brings to the Board a deep expertise in global media and technology organizations in online business.

27.    Upon information and belief, Defendant Banse is a citizen of California.

**Defendant Biggs**

28.    Defendant Biggs has served as a Company director since January 2022 and also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Biggs beneficially owned 1,009 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Biggs owned approximately $349,820 worth of Adobe stock.

29.    For the 2022 Fiscal Year, Defendant Biggs received $420,195 in total compensation from the Company. This included $67,693 in fees earned or paid in cash and $352,502 in stock awards.

30.    The 2023 Proxy Statement stated the following about Defendant Biggs:

Mr. Biggs is the former Executive Vice President and Chief Financial Officer for Walmart Inc. In his role as Chief Financial Officer at Walmart Inc., in which he served from 2016 until June 2022, he was responsible for all finance functions as well as Global Procurement. Prior to the Chief Financial Officer role, Mr. Biggs held the roles of Chief Financial Officer for Walmart International, Walmart U.S. and Sam's Club. Mr. Biggs also served as Senior Vice President for International Strategy, Mergers and Acquisitions and as Senior Vice President of Corporate Finance, as well as Senior Vice President of Operations for Sam's Club. Before joining Walmart in 2000, Mr. Biggs held various M&A and corporate finance positions at Leggett & Platt, Phillips Petroleum Co. and Price Waterhouse. He holds a bachelor's degree in accounting from Harding University and an MBA with Honors from Oklahoma State University.

With his roles at Walmart and other prior executive positions, Mr. Biggs brings to the Board extensive executive experience and financial expertise, including in-depth knowledge of the complex financial and operational issues facing large global

companies and an understanding of accounting principles and financial reporting rules and regulations.

31.     Upon information and belief, Defendant Biggs is a citizen of California.

**Defendant Boulden**

32.     Defendant Boulden has served as Company director since October 2020. She also serves as a member of the Executive Compensation Committee. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Boulden beneficially owned 1,596 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Boulden owned approximately $553,333 worth of Adobe stock.

33.     For the 2022 Fiscal Year, Defendant Boulden received $357,536 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $282,536 in stock awards. For the 2021 Fiscal Year, Defendant Boulden received $391,239 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $316,239 in stock awards.

34.     The 2023 Proxy Statement stated the following about Defendant Boulden:

Ms. Boulden currently serves as Executive Vice President and Chief Growth Officer for Tyson Foods, Inc. responsible for all aspects of global brand marketing to foster the growth of the company's portfolio of brands and products. Prior to her current role, from January 2021 to December 2022, Ms. Boulden was Chief Marketing Officer of the Coca-Cola North America responsible for a multibillion-dollar brand portfolio consisting of 20+ brands, including Coca-Cola, Sprite, smartwater and Minute Maid. Prior to becoming Chief Marketing Officer, Ms. Boulden was President of the Stills Business Unit at Coca-Cola North America from April 2020 to January 2021, leading the water, sports drinks, tea and coffee businesses, and was President and General Manager of Venturing and Emerging Brands from August 2019 to April 2020. Ms. Boulden also served as the Global Head of Marketing and Brand Management at Reebok from May 2018 to June 2019 and has held marketing and general management roles at Crayola, Kraft Foods and Henkel Consumer Goods. Ms. Boulden holds a B.S. in English from Iowa State University and an MBA with concentrations in marketing and finance from The

University of Iowa.

With her current role as Chief Growth Officer at Tyson Foods, Inc., together with her previous roles managing some of the world's most well-known brands, Ms. Boulden brings to the Board extensive experience and deep expertise in global marketing and brand management.

35.     Upon information and belief, Defendant Boulden is a citizen of California.

**Defendant Calderoni**

36.     Defendant Calderoni has served as a Company director since 2012 and as Lead Director since 2020. He also serves as Chair of the Governance and Sustainability Committee. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Calderoni beneficially owned 30,348 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Calderoni owned approximately $10.5 million worth of Adobe stock.

37.     For the 2022 Fiscal Year, Defendant Calderoni received $412,536 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $282,536 in stock awards. For the 2021 Fiscal Year, Defendant Calderoni received $446,239 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $316,239 in stock awards.

38.     The 2023 Proxy Statement stated the following about Defendant Calderoni:

Mr. Calderoni served as the Chairman and Chief Executive Officer of Anaplan, Inc., a planning and performance management platform provider, until June 2022. Prior to joining Anaplan in January 2017, he served as Executive Vice President, Operations and Chief Financial Officer at Red Hat, Inc. from June 2015 to December 2016. Until June 2015, he was an Executive Advisor at Cisco Systems, Inc. ("Cisco"), a designer, manufacturer and seller of IP-based networking and other products related to the communications and information technology industry. From 2008 to January 2015, Mr. Calderoni served as Executive Vice President and Chief Financial Officer at Cisco, managing the company's financial strategy and operations. He joined Cisco in 2004 from QLogic Corporation, a storage networking company where he was Senior Vice President and Chief Financial Officer. Prior to that, he was Senior Vice President, Finance and Administration

and Chief Financial Officer for SanDisk Corporation, a flash data storage company. Before joining SanDisk, Mr. Calderoni spent 21 years at IBM, a global services, software and systems company, where he became Vice President and held controller responsibilities for several divisions within the company. Mr. Calderoni holds a B.S. in Accounting and Finance from Fordham University and an MBA in Finance from Pace University.

As a result of his position at Anaplan, as well as his past service as chief financial officer of publicly traded global technology companies, Mr. Calderoni brings to the Board abundant financial expertise that includes extensive knowledge of the complex financial and operational issues facing large global companies and a deep understanding of accounting principles and financial reporting rules and regulations. He provides the Board with significant insight into the preparation of financial statements and knowledge of audit procedures. Through his senior executive positions, Mr. Calderoni has demonstrated his global leadership and business acumen.

39.     Upon information and belief, Defendant Calderoni is a citizen of California.

**Defendant Desmond**

40.     Defendant Desmond has served as Company director since 2012. She also serves as a member of the Executive Compensation Committee. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Desmond beneficially owned 30,266 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Desmond owned approximately $10.5 million worth of Adobe stock.

41.     For the 2022 Fiscal Year, Defendant Desmond received $357,536 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $282,536 in stock awards. For the 2021 Fiscal Year, Defendant Desmond received $391,239 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $316,239 in stock awards.

42.     The 2023 Proxy Statement stated the following about Defendant Desmond:

Ms. Desmond is currently Chief Executive Officer of Smartly.io, an advertising

12

technology company. She is also the Founder and Chief Executive Officer of Eagle Vista Partners, a strategic advisory and investment firm focused on marketing and digital technology, and an Operating Partner in the Media & Technology Practice at Providence Equity Partners L.L.C., a private equity investment firm. Prior to this, she was the Chief Revenue Officer of Publicis Groupe, a group of global marketing, communication and business transformation companies from December 2016 to December 2017. From 2008 to December 2016, she was the Global Chief Executive Officer of Starcom MediaVest Group ("SMG"), a global marketing and media services company which is part of the Publicis Groupe. Prior to her appointment as Global Chief Executive Officer in 2008, Ms. Desmond was Chief Executive Officer of SMG - The Americas from 2007 to 2008 where she managed a network spanning the United States, Canada and Latin America. She was Chief Executive Officer of MediaVest, based in New York, from 2003 to 2007, and from 2000 to 2002 she was Chief Executive Officer of SMG's Latin America group. She holds a B.B.A. in Marketing from the University of Iowa.

With her extensive experience as a strategist, consultant and investor working with global marketers, media companies and brands, including serving as Chief Revenue Officer of Publicis Groupe and Global Chief Executive Officer of SMG, Ms. Desmond brings to the Board a deep expertise in global media and marketing technology organizations, leadership capabilities and business acumen. In addition, her present and past service on other boards gives her valuable knowledge and perspective. As an expert in the marketing space, Ms. Desmond speaks frequently with Adobe's management outside of scheduled board meetings to provide specific insight regarding Adobe's Digital Experience business.

43.     Upon information and belief, Defendant Desmond is a citizen of Illinois.

**Defendant Durn**

44.     Defendant Durn has served as the Company's CFO and Executive Vice President, Finance, Technology Services and Operations since October 2021. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Durn beneficially owned 14,876 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Durn owned approximately $5.1 million worth of Adobe stock.

45.     For the 2022 Fiscal Year, Defendant Durn received $13,289,714 in total compensation from the Company. This included $850,000 in salary, $8,502,393 in stock awards, $3,100,000 in bonus, $807,500 in non-equity incentive plan compensation, and $29,821 in all other

compensation. For the 2021 Fiscal Year, Defendant Durn received $32,007,054 in total compensation from the Company. This included $114,423 in salary, $3,100,000 in bonus, $28,674,470 in stock awards, $117,373 in non-equity incentive plan compensation, and $788 in all other compensation.

46.     The Adobe Website stated the following about Defendant Durn:

Dan was appointed to the role of CFO and executive vice president in October 2021 and leads the Finance, Technology Services and Operations organization. Dan is applying his years of technology and finance knowledge and experience to oversee Adobe's company-wide operations with rigor and ongoing excellence, drive enablement at scale, and power innovation across the organization.

Dan brings extensive expertise in global strategy, financial planning and operations and mergers and acquisitions, and decades of experience in the technology industry. Durn most recently served as a senior vice president and CFO of Applied Materials from 2017 to 2021. He was previously executive vice president and CFO at NXP Semiconductors N.V. following its merger with Freescale Semiconductor. Before Freescale, Dan was CFO and executive vice president of Finance and Administration at GlobalFoundries and served as managing director, head of Mergers and Acquisitions and Strategy at Mubadala Technology Fund. Prior to that, Dan was vice president of Mergers and Acquisitions in the technology practice at Goldman Sachs & Company.

Dan received his M.B.A. in Finance from the Columbia Business School and graduated from the U.S. Naval Academy with a B.S. in Control Systems Engineering. He served in the Navy for six years, reaching the rank of lieutenant.

47.     Upon information and belief, Defendant Durn is a citizen of California.

**Defendant Murphy**

48.     Defendant Murphy served as the Company's CFO from April 2018 until October 18, 2021.

49.     For the 2021 Fiscal Year, Defendant Murphy received $7,810,498 in total compensation from the Company. This included $607,500 in salary, $664,950 in bonus, $6,528,520 in stock awards, and $9,528 in all other compensation.

50.     The Schedule 14A the Company filed with the SEC on March 5, 2021 (the "2021

Proxy Statement") stated the following about Defendant Murphy:

> Mr. Murphy currently serves as our Executive Vice President and Chief Financial Officer. He joined Adobe in March 2017 and served as our Senior Vice President, Chief Accounting Officer and Corporate Controller until April 2018. Prior to joining Adobe, Mr. Murphy served as Senior Vice President, Chief Accounting Officer and Corporate Controller of Qualcomm Incorporated from September 2014 to March 2017. He previously served as Senior Vice President, Controller and Chief Accounting Officer of DIRECTV Inc. from November 2007 to August 2014, and Vice President and General Auditor of DIRECTV from October 2004 to November 2007. Prior to joining DIRECTV he worked at several global companies, including Experian, Nestle, and Atlantic Richfield (ARCO), in a variety of finance and accounting roles. He served as Director of DirecTV Holdings LLC from November 2007 until August 2014. Mr. Murphy serves on the Corporate Advisory Board of the Marshall School of Business at the University of Southern California. He holds an MBA from the Marshall School of Business at the University of Southern California, a B.S. in Accounting from Fordham University.

51.     Upon information and belief, Defendant Murphy is a citizen of California.

**Defendant Narayen**

52.     Defendant Narayen has served as a Company director since 2007 and as Chairman of the Board since 2017. Defendant Narayen also currently serves as the Company's CEO. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Narayen beneficially owned 437,383 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Narayen owned approximately $151.6 million worth of Adobe stock.

53.     For the 2022 Fiscal Year, Defendant Narayen received $31,600,311 in total compensation from the Company. This included $1,413,461 in salary, $27,162,373 in stock awards, $2,680,357 in non-equity incentive plan compensation, and $344,120 in all other compensation. For the 2021 Fiscal Year, Defendant Narayen received $36,128,725 in total compensation from the Company. This included $1,019,231 in salary, $32,499,671 in stock awards, $2,180,000 in non-equity incentive plan compensation, and $429,823 in all other

compensation.

54.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Narayen made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| September 24, 2021 | 40,000 | $620.78 | $24,831,200 |

Thus, in total, before the fraud was exposed, he sold 40,000 shares of Company stock on inside information, for which he received approximately $24,831,200 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

55.     The 2023 Proxy Statement stated the following about Defendant Narayen:

Mr. Narayen currently serves as our Chief Executive Officer and Chairman of the Board. He joined Adobe in January 1998 as Vice President and General Manager of our engineering technology group. In January 1999, he was promoted to Senior Vice President, Worldwide Products, and in March 2001, he was promoted to Executive Vice President, Worldwide Product Marketing and Development. In January 2005, Mr. Narayen was promoted to President and Chief Operating Officer, and effective December 2007, he was appointed our Chief Executive Officer and joined our Board. In January 2017, he was named our Chairman of the Board. Mr. Narayen holds a B.S. in Electronics Engineering from Osmania University in India, an M.S. in Computer Science from Bowling Green State University and an MBA from the Haas School of Business, University of California, Berkeley.

As our Chief Executive Officer, Chairman of the Board and as an Adobe employee for more than 20 years, Mr. Narayen brings to the Board extensive leadership and industry experience, including a deep knowledge and understanding of our business, operations and employees, the opportunities and risks faced by Adobe, and management's current and future strategy and plans. In addition, his service on other boards gives him a strong understanding of his role as a director and a broad perspective on key industry issues and corporate governance matters.

56.     Upon information and belief, Defendant Narayen is a citizen of California.

**Defendant Neumann**

57.     Defendant Neumann has served as a Company director since January 2022.  He

16

also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Neumann beneficially owned 919 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Neumann owned approximately $318,617 worth of Adobe stock.

58.     For the 2022 Fiscal Year, Defendant Neumann received $420,195 in total compensation from the Company. This included $67,693 in fees earned or paid in cash and $352,502 in stock awards.

59.     The 2023 Proxy Statement stated the following about Defendant Neumann:

Mr. Neumann currently serves as the Chief Financial Officer for Netflix, Inc. Before joining Netflix, Mr. Neumann served as Chief Financial Officer for Activision Blizzard, Inc. from June 2017 to January 2019 and previously held several senior positions at The Walt Disney Company, including Chief Financial Officer and Executive Vice President of Global Guest Experience for Walt Disney Parks and Resorts from 2012 to 2017. Prior to that, he held roles at private equity firms Providence Equity Partners and Summit Partners. He holds a B.A. in Economics and an MBA from Harvard University.

As a result of his position at Netflix, as well as his previous executive positions, Mr. Neumann brings to the Board extensive experience and financial expertise, including an in-depth knowledge of the complex financial and operational issues facing large global companies and a deep understanding of accounting principles and financial reporting rules and regulations.

60.     Upon information and belief, Defendant Neumann is a citizen of California.

**Defendant Oberg**

61.     Defendant Oberg has served as a Company director since 2019. She also serves as Chair of the Audit Committee and as a member of the Governance and Sustainability Committee. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Oberg beneficially owned 2,881 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant

Oberg owned approximately $998,842 worth of Adobe stock.

62.     For the 2022 Fiscal Year, Defendant Oberg received $392,536 in total compensation from the Company. This included $282,536 in stock awards and $110,000 in fees earned or paid in cash. For the 2021 Fiscal Year, Defendant Oberg received $426,239 in total compensation from the Company. This included $316,239 in stock awards and $110,000 in fees earned or paid in cash.

63.     The 2023 Proxy Statement stated the following about Defendant Oberg:

Ms. Oberg currently serves as Chief Financial Officer and Executive Vice President, Development for Marriott International, Inc. Beginning in 2013 and until January 2016, Ms. Oberg served as Chief Financial Officer for The Ritz-Carlton Hotel Company, L.L.C. From 2008 until she joined Ritz-Carlton in 2013, Ms. Oberg served as Marriott's Senior Vice President, Corporate Development Finance and from 2006 to 2008, she served as Marriott's Senior Vice President, International Project Finance and Asset Management for Europe, the Middle East and Africa, and as the senior finance executive for the region. Ms. Oberg's career with Marriott began in 1999 where she served as a member of its Investor Relations group. Prior to initially joining Marriott, Ms. Oberg held various financial leadership positions with Sodexo, Sallie Mae Bank, The Goldman Sachs Group, Inc. and The Chase Manhattan Bank. Ms. Oberg holds a B.S. in Commerce with concentrations in Finance/Management Information Systems from the University of Virginia, McIntire School of Commerce and an MBA from the Stanford University Graduate School of Business.

As a result of her position at Marriott and her past service in financial leadership positions, Ms. Oberg brings to the Board financial expertise, including an in-depth knowledge of financial reporting rules and regulations and accounting principles. Her deep understanding of the multifaceted financial and operational issues affecting large global organizations and leadership experience with development projects and merger and acquisition opportunities brings the Board and Audit Committee valuable insight into preparing long-range plans, annual budgets and capital allocation strategy.

64.     Upon information and belief, Defendant Oberg is a citizen of Maryland.

**Defendant Pandey**

65.     Defendant Pandey has served as a Company director since 2019. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of February 21,

2023, Defendant Pandey beneficially owned 3,551 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Pandey owned approximately $1.2 million worth of Adobe stock.

66.     For the 2022 Fiscal Year, Defendant Pandey received $362,536 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $282,536 in stock awards. For the 2021 Fiscal Year, Defendant Pandey received $396,239 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $316,239 in stock awards.

67.     The 2023 Proxy Statement stated the following about Defendant Pandey:

Mr. Pandey is the Chairman and Chief Executive Officer of DevRev, Inc., a SaaS company that is focused on using AI and design to automate software and customer engineering workflows. Previously, he co-founded Nutanix, Inc. in 2009 and served as its Chief Executive Officer and as the Chairman of its board of directors until December 2020. Mr. Pandey also served as the President of Nutanix, Inc. from September 2009 until February 2016. Between September 2007 and September 2009, he served as Vice President (and Director) of Engineering at Aster Data Systems, Inc. (later acquired by Teradata Corporation), a data warehousing company. Prior to Teradata, Mr. Pandey served in software engineering roles at Oracle Corporation, Zambeel, Inc. and Trilogy Software, Inc. Mr. Pandey holds a Bachelor of Technology in Computer Science from the Indian Institute of Technology, Kanpur and a M.S. in Computer Science from the University of Texas at Austin. He was a Graduate Fellow of Computer Science in the University of Texas at Austin Ph.D. program.

With his experience in the technology industry as a global executive leader and technologist, including co-founding and serving as Chief Executive Officer and Chairman of DevRev, Inc. and Nutanix, Inc. and as a software engineer at various companies over the course of nearly 20 years, Mr. Pandey brings to the Board engineering expertise, financial acumen, an in-depth understanding of the technology landscape and valuable insight on growing a company from a start-up to a publicly traded company.

68.     Upon information and belief, Defendant Pandey is a citizen of California.

**Defendant Ricks**

69.     Defendant Ricks has served as a Company director since 2018. He also serves as a

member of the Executive Compensation Committee. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Ricks beneficially owned 5,811 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Ricks owned approximately $2 million worth of Adobe stock.

70.     For the 2022 Fiscal Year, Defendant Ricks received $357,536 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $282,536 in stock awards. For the 2021 Fiscal Year, Defendant Ricks received $391,239 in total compensation from the Company. This included $75,000 in fees earned or paid in cash and $316,239 in stock awards.

71.     The 2023 Proxy Statement stated the following about Defendant Ricks:

Mr. Ricks currently serves as Chief Executive Officer of Eli Lilly and Company and became Chair of the Eli Lilly and Company board of directors in June 2017. Prior to January 2017, Mr. Ricks served as President of Lilly Bio-Medicines. From 2009 to 2012, he served as President of Lilly USA, LLC, Eli Lilly and Company's largest affiliate. Mr. Ricks served as President and General Manager of Lilly China, operating in one of the world's fastest-growing emerging markets, from 2008 to 2009. He was general manager of Lilly Canada from 2005 to 2008, after roles as Director of Pharmaceutical Marketing and National Sales Director in Canada. Mr. Ricks joined Eli Lilly and Company in 1996 as a Business Development Associate and held several management roles in U.S. marketing and sales before moving to Lilly Canada. Mr. Ricks earned a B.S. from Purdue University in 1990 and an MBA from Indiana University in 1996.

As Chair and Chief Executive Officer of a large, innovation-focused, global company, Mr. Ricks brings to the Board executive leadership, marketing, sales and financial expertise, business acumen and relevant worldwide operational insight.

72.     Upon information and belief, Defendant Ricks is a citizen of Indiana.

**Defendant Rosensweig**

73.     Defendant Rosensweig has served as a Company director since 2009. He also serves as a member of the Governance and Sustainability Committee. According to the 2023 Proxy Statement, as of February 21, 2023, Defendant Rosensweig beneficially owned 17,565 shares of

the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2023 was $346.70, Defendant Rosensweig owned approximately $6 million worth of Adobe stock.

74.     For the 2022 Fiscal Year, Defendant Rosensweig received $353,663 in total compensation from the Company. This included $71,127 in fees earned or paid in cash and $282,536 in stock awards. For the 2021 Fiscal Year, Defendant Rosensweig received $396,239 in total compensation from the Company. This included $80,000 in fees earned of paid in cash and $316,239 in stock awards.

75.     The 2023 Proxy Statement stated the following about Defendant Rosensweig:

Mr. Rosensweig is currently President, Chief Executive Officer and Co-chairman of the board of directors of Chegg.com, an online textbook rental company. Prior to joining Chegg.com in February 2010, Mr. Rosensweig served as President and Chief Executive Officer of RedOctane, a business unit of Activision Publishing, Inc., a developer, publisher and distributor of interactive entertainment and leisure products. Prior to joining RedOctane in March 2009, Mr. Rosensweig was an Operating Principal at the Quadrangle Group LLC, a private investment firm. Prior to joining the Quadrangle Group in August 2007, Mr. Rosensweig served as Chief Operating Officer of Yahoo! Inc., which he joined in April 2002. Prior to joining Yahoo!, Mr. Rosensweig was President of CNET Networks, Inc., an interactive media company, which he joined in October 2000. Mr. Rosensweig served for 18 years with Ziff-Davis, LLC, an integrated media and marketing services company, including roles as President and Chief Executive Officer of its subsidiary ZDNet, from 1997 until 2000 when ZDNet was acquired by CNET. Mr. Rosensweig holds a B.A. in Political Science from Hobart College.

As a result of his current executive position at Chegg.com, as well as his former positions as a senior executive at global media and technology organizations, Mr. Rosensweig provides the Board with extensive and relevant executive leadership, worldwide operations and technology industry experience.

76.     Upon information and belief, Defendant Rosensweig is a citizen of California.

**Defendant Vaas**

77.     Defendant Vaas has been Adobe's Investor Relations Officer from 2011 to the present.

78.    The Company's website states the following about Defendant Vaas in relevant part:

Prior to joining Adobe, Jonathan was an attorney with Sullivan & Worcester and Jones Day. He holds a BA in political science from Ohio State University, as well as a JD from Harvard Law School where he was a cum laude graduate. He is a member of the National Investor Relations Institute, served as a member of the board of trustees for the University of Utah Hospital Foundation for two years, and is currently a board member for the Repertory Dance Theatre in Salt Lake City.

79.    Upon information and belief, Defendant Vaas is a citizen of Utah.

**Defendant Wadhwani**

80.    Mr. Wadhwani joined the company in June 2021 and serves as its President, Digital Media Business.

81.    For the 2022 Fiscal Year, Defendant Wadhwani received $11,649,015 in total compensation from the Company. This included $750,000 in salary, $1,666,667 in bonus, $8,502,393 in stock awards, $712,500 in non-equity incentive plan compensation, and $17,455 in all other compensation. For the 2021 Fiscal Year, Defendant Wadhwani received $19,641,199 in total compensation from the Company. This included $360,577 in salary, $1,666,667 in bonus, $17,223,679 in stock awards, 381,206 in non-equity incentive plan compensation, and $9,070 in all other compensation.

82.    The Company's website states the following about Defendant Wadhwani, in relevant part:

David was most recently a Venture Partner at Greylock Partners. Prior to joining Greylock, he was president and CEO of AppDynamics, leading the company as it transformed to a SaaS-first business and became one of the fastest-growing enterprise software companies at the time.

This is David's second tour of duty at Adobe. He joined Adobe in 2005 through the company's acquisition of Macromedia, Inc., where he had been vice president of developer products. As senior vice president and general manager of Adobe's Digital Media business, David played an instrumental role in advancing the company's category leadership, expanding into new markets and contributing to its successful transformation to a cloud-based subscription business.

David holds a bachelor's degree in computer science from Brown University and serves on the Brown computer science department advisory board. He is also on the digital advisory board of The Metropolitan Museum of Art and on the board of trustees for StoryCorps and the Fine Arts Museums of San Francisco.

83.     Upon information and belief, Defendant Wadhwani is a citizen of California.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

84.     By reason of their positions as officers, directors, and/or fiduciaries of Adobe and because of their ability to control the business and corporate affairs of Adobe, the Individual Defendants owed Adobe and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Adobe in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Adobe and its shareholders so as to benefit all shareholders equally.

85.     Each director and officer of the Company owes to Adobe and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

86.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Adobe, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

87.     To discharge their duties, the officers and directors of Adobe were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

88.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith,

and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Adobe, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Adobe's Board at all relevant times.

89.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

90.     To discharge their duties, the officers and directors of Adobe were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Adobe were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Adobe's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Adobe conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Adobe and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Adobe's operations would comply with all applicable laws and Adobe's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

91.     Each of the Individual Defendants further owed to Adobe and the shareholders the duty of loyalty requiring that each favor Adobe's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

92.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Adobe and were at all times acting within the course and scope of such agency.

93.     Because of their advisory, executive, managerial, directorial, and controlling positions with Adobe, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

94.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Adobe.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

95.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

96.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

97.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Adobe was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

98.    Each of the Individual Defendants aided and abetted and/or rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

99.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Adobe and was at all times acting within the course and scope of such agency.

## ADOBE'S CODES OF CONDUCT

100.    Adobe's Code of Conduct, in a section titled "Adobe Code of Business Conduct" states that "Adobe's Code of Business Conduct outlines the principles that guide our interactions with employees, customers, partners, stockholders, and communities. We hold ourselves to these principles in everything we do.  We strive to communicate openly and honestly, to act fairly and responsibly, and to foster a vibrant, safe, and diverse work environment. In simple terms, our Code reflects our promise always to do the right thing.  It is a key reason we are among the world's most admired companies, and it is vital to our ongoing success."

101.    In a section titled "Overview," the Code of Conduct states the following, in relevant part:

> This Code applies to all Adobe personnel, including any regular employee, Adobe-paid temporary employee, contingent worker (which includes agency temporary employees, independent contractors, and vendor employees), and intern of an Adobe group company. You are expected to comply with this Code any time you perform work for Adobe, represent the company, or participate in company-sponsored events, whether you are on or off Adobe's premises. This Code does not list every legal or ethical issue that you may face during business; rather, it is meant to guide your actions and be applied using your common sense and good judgment.

102.    In a section titled "Ensuring Proper Use of Adobe's Assets" the Code of Conduct states the following, in relevant part:

> We expect all personnel to protect Adobe's assets and use company resources only to perform legitimate business functions (and for reasonable personal purposes, as allowed by Adobe's policies).  This means you may not use Adobe's assets for any function that you are not authorized to perform, for any illegal purpose, or for any matter that violates the letter or spirit of this Code or other Adobe policies.

103.    In a section titled "Our Individual Conduct," the Code of Conduct states, "We are

each responsible for acting in an ethical way and complying with applicable laws."

104.    In a section titled "Avoiding Conflicts of Interest," the Code of Conduct states the following:

> Adobe takes an active role in managing conflicts of interest. A conflict of interest can arise from any personal activities or relationships that influence, or appear to influence, your ability to act in the best interests of Adobe.   You are encouraged to be transparent so that potential conflicts can be identified early and appropriate precautions can be taken to protect both you and Adobe.  If you have a circumstance that potentially conflicts with Adobe's interests, you must disclose it to the Adobe Compliance Office and follow any controls deemed necessary for Adobe to ensure that individuals who make decisions or are otherwise involved can exercise independent business judgment in Adobe's best interest.  Any activity that competes with Adobe or opposes Adobe's interests will not be permitted.

105.    In a section titled "Insider Trading," the Code of Conduct states the following, in relevant part:

> If you trade on the basis of Insider Information, or tip Insider Information to others, you may be personally liable for civil and criminal fines and face the possibility of a jail sentence.  To help protect you from violating insider trading laws, Adobe has established quarterly trading window procedures that establish when you can and cannot trade Adobe stock.  However, it is ultimately your responsibility to avoid trading any stock on the basis of Insider Information at any time, regardless of whether the trading window is open.

106.    In a section titled "Maintaining Accurate Books and Records" the Code of Conduct states the following:

> Adobe is required by law to keep books and records that accurately reflect the true nature of our operations and finances.  We ensure that all documentation is complete and correct. It is a violation of this Code and our company policies to intentionally omit, hide, or disguise the nature of any transaction or liability in Adobe's books and records.  Falsification of business documents, whether or not it results in personal or commercial gain, is never permitted and may result in termination of your employment or business relationship with Adobe.  Cash or other assets may never be maintained for any purpose in any unrecorded or "off-the-books" accounts. You are never permitted to misclassify the account or accounting period of any transaction, or to misrepresent the nature of a transaction. You must obtain appropriate authorization for all Adobe business transactions and provide all necessary supporting documentation in a thorough and timely manner.

All transaction documents must be properly recorded and reflected in Adobe's books and records.

107.    In the section titled "Violations," the Code of Conduct states the following:

Adobe takes allegations seriously and promptly conducts investigations into reported incidents.  Anyone who is found to violate this Code or other Adobe policies may be subject to immediate disciplinary action including termination of employment or affiliation with Adobe.

108.    In the section titled "Waivers," the Code of Conduct states the following:

A waiver of this Code requires approval of the Chief Compliance Officer or General Counsel.  The Adobe Board of Directors or a committee of the Board, to the extent permitted by applicable regulatory and NASDAQ rules, must also approve any waiver of this Code with respect to Adobe's executive officers (which may include, as required by applicable laws, our principal executive officer; principal financial officer; principal accounting officer or controller; or persons performing similar functions) or members of our Board of Directors.  Any waiver may be disclosed to stockholders as required by applicable laws, rules, and regulations.

109.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## ADOBE'S AUDIT COMMITTEE CHARTER

110.    The Company also maintains an Audit Committee Charter (the "Charter"). According to the Charter, the purpose of the Audit Committee is to, *inter alia*:

Assist the Board in fulfilling its responsibilities to oversee management's financial,

accounting and reporting processes, the Company's system of internal accounting and financial controls, the Company's enterprise risk management program and the Company's compliance with related legal, regulatory and ethical requirements. The Committee shall also review the qualifications, independence and performance of the independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other review or attest services to the Company as required under the federal securities laws (the "Independent Auditor") and shall directly and solely approve the appointment and terms of engagement of, and retain and oversee, the Independent Auditor. The Committee shall prepare any reports required by the Committee under rules of the Securities and Exchange Commission (the "SEC"). The Committee shall regularly report its activities to the Board.

111.    In a section titled "Responsibilities," the Charter states that the Audit Committee shall be tasked with, among other things:

Review and discuss with management and the Independent Auditor the Company's annual audited and quarterly financial statements, including the effect of regulatory and accounting initiatives, and any certification, report, opinion or review rendered by the Independent Auditor, and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

112.    The section continues by providing another responsibility of the Audit Committee, in regard to waiver:

Review the code of ethics for senior officers, and ensure prompt disclosure to the public, as required by applicable law or regulation, of such code of ethics and of any change in, or waiver of, such code of ethics.

113.    The section continues by providing another responsibility of the Audit Committee in regard to material impacts on the Company:

Review periodically with the general counsel legal and regulatory matters that could have a material impact on the Company's financial statements or compliance policies, including any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

114.    In violation of the Charter, Defendants Biggs, Neumann, Oberg, and Pandey failed to adequately review and discuss the Company's quarterly earnings press releases; failed to

adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal controls over financial reporting, disclosure controls and procedures, and Code of Conduct.

### THE INDIVIDUAL DEFENDANTS' MISCONDUCT

115.    Adobe is a Delaware corporation headquartered in San Jose, California which was founded in 1982 and creates software for document sharing and design. Adobe delivers purportedly groundbreaking innovations such as Illustrator, the ubiquitous PDF file format and Acrobat, Photoshop and Premiere Pro.

**False and Misleading Statements**

***July 23, 2021, Scotia Bank Q&A***

116.    The Relevant Period began on July 23, 2021 when various of the Individual Defendants attended a public investor question-and-answer session hosted by Scotiabank. During the session, Defendant Vaas, Adobe's Vice President of Investor Relations, stated the following:

> *For the creative business, there's not a competitor, a single competitor that has anything approaching the set of content creation apps across all of these different categories and media types that we have. So, the answer to the question will be kind of drilling down into the particular point products and asking what are the other alternatives there.*
>
> I think of -- in a general way, I would say if you look at competition in terms of every photograph that's taken in the world and how that photograph is edited, there's an ecosystem of free tools that people can use, and that kind of gets them started. That gets them interested in being content creators. And those are -- from simple cropping and editing apps that are within an iPhone, for example, or simple editing apps that are on some web-based platforms.
>
> But once they're interested in being able to do more and take their content creation to the next level, they come to Adobe. Other competitors that monetize the tools -- so one place that we played in for years is the video editing space. That's one where Adobe Premiere is the clear leader. Apple has been a competitor with a final product, not as much in the Pro segment anymore, but in the Hobbyist segment.
>
>        * * *
>
> In terms of -- a newer category is experience design. We think experience-led

thinking, experience design product development is a paradigm that's going to continue to grow that category. And that's a newer category where there's some other point solution providers, like InVision and Sketch and Figma. I could go on and on. ***But effectively, in that business, a few of our products tend to have a few point players that compete with us. But end-to-end, there's not really a major competitor.***[1]

### September 29, 2021 Form 10-Q

117.    On September 29, 2021, Adobe filed a Form 10-Q with the SEC for the quarterly period ended September 3, 2021 (the "Q3 2021 10-Q") with the SEC. Attached to the Q3 2021 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Narayen and Murphy attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

118.    The Q3 2021 10-Q stated the following about potential risks associated with Adobe's inability to offer new products:

***Our competitive position and results of operations could be harmed if we do not compete effectively.***

The markets for our products and services are characterized by intense competition, new industry standards, evolving distribution models, limited barriers to entry, disruptive technology developments, short product life cycles, customer price sensitivity, global market conditions and frequent product introductions (including alternatives with limited functionality available at lower costs or free of charge). Any of these factors could create downward pressure on pricing and gross margins and could adversely affect our renewal and upsell and cross-sell rates, as well as our ability to attract new customers. Our future success will depend on our continued ability to enhance and integrate our existing products and services, introduce new products and services in a timely and costeffective manner, meet changing customer expectations and needs, extend our core technology into new applications, and anticipate emerging standards, business models, software delivery methods and other technological developments. Furthermore, some of our competitors and potential competitors enjoy competitive advantages such as greater financial, technical, sales, marketing and other resources, broader brand awareness and access to larger customer bases. As a result of these advantages, potential and current customers might select the products and services of our competitors,

---

[1] Any emphasis contained in this complaint has been added unless otherwise specified herein.

causing a loss of our market share. In addition, consolidation has occurred among some of our competitors. Further consolidations in these markets may subject us to increased competitive pressures and may harm our results of operations.

***

*If we cannot continue to develop, acquire, market and offer new products and services or enhancements to existing products and services that meet customer requirements, our operating results could suffer.*

**January 5, 2022 Evercore ISI Event**

119.    On January 5, 2022, Defendant Vaas spoke at an event hosted by Evercore ISI, again discussing potential competition from Figma. In relevant part, Defendant Vaas stated the following:

> [Analyst:] When you think about Canva or Figma, how do you -- how should investors sort of frame that? I mean, like, to me, they seem like market expander, sort of they're helping you all expand the market. I don't get the sense that these are competitors and sort of the enterprise or even the sort of group part of your business. . . .

> Vaas: Yes. I think there's definitely -- when you look overall in the ecosystem in software, there are some things that other companies are doing that validate the explosiveness of these markets that we're competing in, right? And if you look at the TAM for Creative, that -- it's built up of Creative professionals where we said that's growing to $25 billion by 2024. That shows you how much runway there is just in that top end of the Creative professional market.

> In the communicators bucket, that's growing now to north of $30 billion, and that's due to a number of things, but a lot of knowledge workers -- and like I said, people that just aren't expert in creativity, but have a story to tell, they're turning to creative tools rather than maybe -- they might have turned up to something like PowerPoint before for office presentations. And there are other companies that are expanding the market and kind of validating the enthusiasm and the spending potential for people that want to create content is very real out there.

> I think until Creative Cloud Express was launched, we saw -- it was definitely more of a complementary situation where we would see people start out on simpler tools. And then when they're ready to do more and advance to high-fidelity content creation, they'd come over to Adobe. We've seen that since Microsoft Paint. We've seen that with simple content editors in social media platforms and on phones and some of these start-ups out there in the world.

> I think with Creative Cloud Express, Adobe is making more of a strategic decision now to take all of the science that we've built and go down market and really

compete, not just be the place they turn to when they're ready to do more, but the place they learn and start as well. And then we're building bridges from the point of entry, making it extremely simple to get started, all the way through much more complex creation like with Video and Premier and After Effects.

### January 11, 2022 Bank of America Event

120.    On January 11, 2022, Defendant Vaas attended an event hosted by Bank of America, wherein he again downplayed Adobe's competition from companies like Figma or Canva. In relevant part, Defendant Vaas stated the following:

[Analyst:] There's some high-profile private companies facing capital at high valuations, Canva and Figma. Have you seen these 2 offerings in the marketplace? When you think about the competitive landscape here, what are Adobe's strengths general? And maybe specific to those 2, how do you see those 2?

Vaas: Sure. Yes. When you look at a $63 billion TAM, I think more than any other company, that's Adobe's opportunity. There are definitely other point solution players, who have, I think, had a role in expanding that TAM as we see millions of new people really interested in content creation. Certainly, some other companies validating the secular tailwinds that are driving expansion in that market. *I would say almost to the company that I could think about, everyone else we see as a point solution provider.* They're a single product company that's found a niche with a growing universe of users. And there's some companies that have good momentum in that space.

***

With Creative Cloud Express, you can see that we now have democratized our own tools to the level that we want people to get started and begin their journey with Adobe. *And the big differentiation from us, this applies, you mentioned Figma, any other company, there are some competitors in video editing, for example. But they're all point solutions.*

*Whereas we have this cloud connected collaborative system of applications that all work together and we say creativity is a multiplayer sport. And from the file types they use, to color templates and fonts, we have it all connected together in a way where there's bridges we build between creators and journeys for people to break out of simple templates and do more and do more.*

*And so I don't see a competitor that sort of has anything approaching that end-to-end strategic position that Adobe does*, but there's definitely other companies that are seeing the global enthusiasm around content creation. And I think overall, that's a good thing for Adobe and it's a good thing for the expanding market.

### January 20, 2022, Wolfe Research Industry Event

121.   On January 20, 2022, Defendant Wadhwani, the Company's Digital Media President, attended an event held by Wolfe Research, wherein he stated the following:

[Analyst]: [L]et's go with where the video kind of ended, which is Creative Cloud Express creativity for everyone. . . . And the #1 question I get, and I'm sure Mr. Vaas gets from most investors right now, particularly in light of the last quarter, really the second half of last year, what about the competition? What about Canva and Figma? And aren't they -- for the first time -- not for the first time, the first time in recent memory Adobe has real competition, and they're taking share. So let's talk about the key elements. Both of you, VC backgrounds, not that long ago, saw these companies in the markets. What is the competitive environment? What is the answer? If it's an answer or if let's say an opportunity? I want both of you individually to address this topic because I think it's one that's near and dear to investor hearts.

Wadhwani: Yes. . . . So at a high level, I think you have to look at, first of all, look at just the fundamentals of Adobe's business. I mean we ended last year with adding almost $2 billion of net new ARR. So clearly, the foundation and the tailwind that's been driving us is there and has been consistently there for a long time.

Secondly, we guided our highest guide ever for FY '22 in the digital media business. And that's the foundation of how we think about where we're going. It's very consistent with the kinds of guides we've given historically and it gives you a sense of where we're going now. Some of this, I think it's worth just sort of addressing directly comes from questions that we've had in the second half of the year and associated with sort of how people are interpreting the results we had. And there is some episodic activity that is harder to predict with the pandemic. We've talked a bunch about in the past things associated with summer travel. We've talked about sort of some changes in terms of holiday season buying behavior. But those are 2 episodic events that when you look at it in the context of the performance last year and you look at the -- in the context of the guide, really underscores how confident we are about the market opportunity ahead, right?

We also talked about recently how we're thinking about the market, which is different than what we've thought about before. We really look at the creative professional market as one that's accelerating and growing very quickly. We see this new creator economy for communicators coming out, and we said that's about a $30 billion, $34 billion market, I believe we said. And we have a Document Cloud business that's also playing into this big TAM. You add all that together, you have a $100 billion TAM that we're going after.

Now as a company like Adobe historically was playing in a smaller TAM and had a very large presence in that TAM. As this TAM explodes, you should expect to see some competition participating in parts of that TAM. *The surface area is so significant, we should expect to see other entrants playing in and around similar*

*areas. But I'm going to go back to where Scott was leaving off. If you think about it in that context of the professional base, when you look at the fact that there are more creative pros needed in companies than ever before, that's obviously a big tailwind for us.*

### January 21, 2022, Form 10-K

122.    On January 21, 2022, the Company filed a Form 10-K with the SEC for the fiscal year ended December 3, 2021 (the "2021 10-K"), in which the Company made the same statements about competition as those in its Q3 2021 10-Q, as set forth in ¶118 above. The 2021 10-K was signed by, *inter alia*, Defendants Narayen, Durn, Calderoni, Banse, Biggs, Boulden, Desmond, Neumann, Oberg, Pandey, Ricks, and Rosensweig. Additionally, the 2021 10-K contained SOX certifications signed by Defendants Narayen and Durn attesting to its accuracy.

### March 30, 2022 Form 10-Q

123.    On March 30, 2022, the Company filed a Form 10-Q with the SEC for the period ended March 4, 2022 ("Q1 2022 10-Q"), in which Adobe made the same statements about competition as those in its Q3 2021 10-Q, as set forth in ¶118 above. Attached to the 1Q 2022 10-Q were SOX certifications signed by Defendants Narayen and Durn attesting to its accuracy.

### June 16, 2022, Earnings Call

124.    On June 16, 2022, the Company hosted an earnings call with its analysts and investors. During the earnings call, Defendant Wadhwani stated the following:

> Where we see Express filling in is that Express is additive and broadens the reach in that new communicator base because of exactly what you're saying, the freemium business model, the zerofriction onboarding. It's clearly showing that we're able to attract millions of new users into the franchise. And we're able to do it very efficiently by optimizing how we onboard customers from search terms that typically were not ones that we focused on in the past. We also look at the ability to onboard those users and differentiate the offering with the integration of these amazing features that we get from the desktop applications like Adobe Magic. And all of this helps differentiate what we're doing with Express.
>
> And if we take a step back and look at it from a business perspective, we feel very

confident that Adobe Express and the way we actually pull people into that funnel is additive to the market opportunity that we're playing. So we are really emphasizing the ability to add more capabilities there and differentiate there.

I do also want to remind folks that Express is also available to core Creative Cloud customers. And by integrating some of those features into Express, we're enabling workflows between the core Creative Cloud products and also Express, and we believe that's going to have a strong retentive value on the core base. And we just had, in fact, a great quarter with very strong retention for Creative Cloud as well.

***June 29, 2022 Form 10-Q***

125.    On June 29, 2022, Adobe filed a Form 10-Q with the SEC for the quarter ended June 3, 2022 ("Q2 2022 10-Q"), in which the Company made the same statements about competition as those in its Q3 2021 10-Q, as set forth in ¶118 above. Attached to the Q2 2022 10-Q were SOX certifications signed by Defendants Narayen and Durn attesting to its accuracy.

126.    The statements in ¶¶116-125 above were materially false and misleading because they failed to disclose that: (a) Figma was establishing a leadership role in user experience design and growing its market share; (b) Adobe and Figma were in direct competition with regard to user experience design; (c) the Company's "Express" product was not an effective counter to Figma's growing market share in bringing new customers to the Company's paid offerings; (d) the Company's other offerings were failing to successfully compete with Figma on user experience design; and (e) the Company was losing market share to Figma. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH EMERGES**

127.    On September 15, 2022, the truth emerged when Adobe announced that it had entered into an agreement to acquire Figma for $20 billion in cash and stock. Analysts responded

negatively to this news, characterizing the deal as "defensive" (as stated by Evercore), "expensive" (as stated by Credit Suisse), and a contradiction of the Company's Relevant Period statements downplaying Figma's competitive position.

128.    In a report published the same day, Evercore noted that the Company was evidently "losing some momentum to Figma and it was better to buy them out and combine forces" than to allow Figma "to create a bigger beachhead in the enterprise." Similarly, Credit Suisse reported that the deal was priced so high, it represented the highest revenue multiple ever paid for a scaled software-as-a service company. Moreover, BMO Capital Markets also reported that the deal was expensive "even considering Figma's ~100% ARR growth this year."

129.    On this news, the price of Adobe stock fell $62.39 per share, or nearly 17%, from a closing price of $371.52 per share on September 14, 2022, to close at $309.13 on September 15, 2022. That drop caused the Company's market capitalization to fall by a massive $28.9 billion.

130.    Later, on August 7, 2023, the CMA issued a scathing report indicating that Adobe lied throughout the Relevant Period about Figma and Adobe's failed attempts to compete. The report noted that the Company viewed XD—not Express—as its answer to Figma, as both XD and Figma "offer all-in-one screen design." However, by October 2021, the Company had removed more than one hundred positions from Adobe XD (representing the "vast majority" of XD's engineering resources), and in February 2022 it placed XD into "maintenance mode" (the Company's "process for deprioritizing products until they eventually become deprecated, lose their customer base, or are phased out"). In total, the report indicated that Adobe XD was in direct competition with Figma, Figma was leading the market with regard to design software, and that Figma was significantly larger than any other supplier of "all-in-one" screen design software.

**REPURCHASES DURING THE RELEVANT PERIOD**

131.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of almost $4.5 billion to repurchase approximately 9.3 million shares of its own common stock at artificially inflated prices from July 2021 through September 2022.

132.     According to the 3Q 2021 10-Q, between July 3, 2021 and July 30, 2021, the Company purchased 600,000 shares of its common stock for approximately $356,940,000.00 at an average price of $594.90 per share.

133.     As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the Company overpaid by approximately $171,462,000.00 for repurchases of its own stock between July 3, 2021 and July 30, 2021.

134.     According to the 3Q 2021 10-Q, between July 31, 2021 and September 3, 2021, the Company purchased 500,000 shares of its common stock for approximately $313,730,000.00 at an average price of $627.46 per share.

135.     As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the Company overpaid by approximately $159,165,000.00 for repurchases of its own stock between July 31, 2021 and September 3, 2021.

136.     According to the 2021 10-K, between September 4, 2021 and October 1, 2021, the Company purchased 500,000 shares of its common stock for approximately $328,235,000.00 at an average price of $656.47 per share.

137.     As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the Company overpaid by approximately $173,670,000.00 for repurchases of its own stock between September 4, 2021, and October1, 2021.

138.     According to the 2021 10-K, between October 2, 2021, and October 29, 2021, the Company purchased 600,000 shares of its common stock for approximately $357,930,000.00 at an average price of $596.55 per share.

139.     As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the Company overpaid by approximately $172,452,000.00 for repurchases of its own stock between October 2, 2021, and October 29, 2021.

140.     According to the 2021 10-K, between October 30, 2021, to December 3, 2021, the Company purchased 500,000 shares of its common stock for approximately $328,535,000.00 at an average price of $657.07 per share.

141.     As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the Company overpaid by approximately $173, 970,000.00 for repurchases of its own stock between October 30, 2021, and December 3, 2021.

142.     According to Q1 2022 10-Q, between December 3, 2021, to December 31, 2021, the Company purchased 600,000 shares of its common stock for approximately $381,090,000.00 at an average price of $635.15 per share.

143.     As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the Company overpaid by approximately $195,612,000.00 for repurchases of its own stock between December 3, 2021, and December 31, 2021.

144.     According to the Q2 2022 10-Q, between April 2, 2022, to April 29, 2022, the Company purchased 900,000 shares of its common stock for approximately $395,721,000.00 at an average price of $439.69 per share.

145.     As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the Company overpaid by approximately $117,504,000.00 for

repurchases of its own stock between April 2, 2022, and April 29, 2022.

146.    According to the Q2 2022 10-Q, between April 30, 2022, to June 3, 2022, the Company purchased 1,000,000 shares of its own common stock for approximately $419,170,000.00 at an average price of $419.17 per share.

147.    As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the company overpaid by approximately $110,040,000.00 for repurchases of its own stock between April 30, 2022, and June 3, 2022.

148.    According to the Form 10-Q Adobe filed its quarterly report for the quarter ended September 28, 2022, ("Q3 2022 10-Q"), between June 4, 2022, to July 1, 2022, the Company purchased 1,000,000 shares of its own common stock for approximately $385,960,000.00 at an average price of $385.96 per share.

149.    As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the company overpaid by approximately $76,830,000.00 for repurchases of its own stock between June 4, 2022, and July 1, 2022.

150.    According to the Q3 2022 10-Q, between July 2, 2022, to July 29, 2022, the Company purchased 1,100,000 shares of its own common stock for approximately $414,392,000.00 at an average price of $376.72 per share.

151.    As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the company overpaid by approximately $74,349,000.00 for repurchases of its own stock between July 2, 2022, and July 29, 2022.

152.    According to the Q3 2022 10-Q, between July 30, 2022 to September 2, 2022, the Company purchased 900,000 shares of its own common stock for approximately $378,522,000.00 at an average price of $420.58 per share.

153.     As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the company overpaid by approximately $100,305,000.00 for repurchases of its own stock between July 30, 2022 and September 2, 2022.

154.     On January 17, 2023, Adobe filed on Form 10-K its annual report for the fiscal year ended December 2, 2022 ("2023 10-K"). According to the 2023 10-K, between September 3, 2022, to September 30, 2022, the Company purchased 1,100,000 shares of its own common stock for approximately $408,144,000.00 at an average price of $371.04 per share.

155.     As the Company's stock was actually worth only $309.13 per share, the price at closing on September 15, 2022, the company overpaid by approximately $68,101,000.00 for repurchases of its own stock between September 3, 2022, and September 30, 2022.

156.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company overpaid by approximately ***1.6 billion*** for repurchases of its own stock during the Relevant Period.

## DAMAGES TO ADOBE

157.     As a direct and proximate result of the Individual Defendants' conduct, Adobe has lost and expended, and will continue to lose and expend, many millions of dollars.

158.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

159.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the

Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

160.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

161.   Such losses include the Company's overpayment of almost $1.6 billion for repurchases of its own stock during the period when the Company's stock price was artificially-inflated due to the false and misleading statements discussed herein.

162.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

163.   As a direct and proximate result of the Individual Defendants' conduct, Adobe has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

164.   Plaintiff brings this action derivatively and for the benefit of Adobe to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Adobe, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act, as well as the aiding and abetting thereof.

165.    Adobe is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

166.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Adobe. Plaintiff will adequately and fairly represent the interests of Adobe in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

167.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

168.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consisted of the following twelve individuals: Defendants Banse, Biggs, Boulden, Calderoni, Desmond, Narayen, Neumann, Oberg, Pandey, Ricks, Rosensweig, (the "Director-Defendants"), and non-party Cristiano Amon (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors that were on the Board at the time this action was commenced.

169.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and, at the same time, to cause Adobe to overpay by almost $1.6 billion for repurchases of its own stock at artificially inflated prices, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

170.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Adobe to issue materially false and misleading statements. Specifically, the Director-Defendants caused Adobe to issue false and misleading statements which were intended to make Adobe appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus, excused.

171.     Additional reasons that demand on Defendant Narayen is futile follow. Defendant Narayen has served as the CEO and President of Adobe at all relevant times and as Chairman of the Board since 2017. As such, the Company provides Defendant Narayen with his principal occupation for which he received lucrative compensation. Thus, as the company admits, he is a non-independent director. As CEO and a director throughout the Relevant Period, Defendant Narayen was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company. Additionally, Defendant Narayen personally signed the 2021 10-K and the SOX certifications attached to the Q3 2021 10-Q, 2021 10-K, Q1 2022 10-Q, and Q2 2022 10-Q, and thus personally made the false and misleading statements contained therein. As the Company's top executive officer and trusted Chairman of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Narayen's insider sales, which yielded approximately $24.8 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover,

Defendant Narayen is a defendant in the Securities Class Action. For these reasons, too, Defendant Narayen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant Banse is futile follow. Defendant Banse has served as a Company director since 2012. Defendant Banse also serves as Chair of the Executive Compensation Committee and as a member of the Governance and Sustainability Committee. Defendant Banse has received and continues to receive handsome compensation for her role as a director of the Board as described above. In addition, she signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Banse breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Biggs is futile follow. Defendant Biggs has served as Company director since January 2022. Defendant Biggs also serves as a member of the Audit Committee. Defendant Biggs has received and continues to receive handsome compensation for his role as a director of the Board as described above. In addition, he signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to

protect corporate assets. For these reasons, too, Defendant Biggs breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.   Additional reasons that demand on Defendant Boulden is futile follow. Defendant Boulden has served as Company director since 2020. Defendant Boulden also serves as a member of the Executive Compensation Committee. Defendant Boulden has received and continues to receive handsome compensation for her role as a director of the Board as described above. In addition, she signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Boulden breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

175.   Additional reasons that demand on Defendant Calderoni is futile follow. Defendant Calderoni has served as Company director since 2012 and as Lead Director since 2020. Defendant Calderoni also serves as a Chair of the Governance and Sustainability Committee. Defendant Calderoni has received and continues to receive handsome compensation for his role as a director of the Board as described above. In addition, he signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For

these reasons, too, Defendant Calderoni breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Desmond is futile follow. Defendant Desmond has served as Company director since 2012. Defendant Desmond also serves as a member of the Executive Compensation Committee. Defendant Desmond has received and continues to receive handsome compensation for her role as a director of the Board as described above. In addition, she signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Desmond breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Neumann is futile follow. Defendant Neumann has served as Company director since January 2022. Defendant Neumann also serves as a member of the Audit Committee. Defendant Neumann has received and continues to receive handsome compensation for his role as a director of the Board as described above. In addition, he signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Neumann breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Oberg is futile follow. Defendant Oberg has served as Company director since 2019. Defendant Oberg also serves as Chair of the Audit Committee and as a member of the Governance and Sustainability Committee. Defendant Oberg has received and continues to receive handsome compensation for her role as a director of the Board as described above. In addition, she signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Oberg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Pandey is futile follow. Defendant Pandey has served as Company director since 2019. Defendant Pandey also serves as a member of the Audit Committee. Defendant Pandey has received and continues to receive handsome compensation for his role as a director of the Board as described above. In addition, he signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Pandey breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.   Additional reasons that demand on Defendant Ricks is futile follow. Defendant Ricks has served as Company director since 2018. Defendant Ricks also serves as a member of the Executive Compensation Committee. Defendant Ricks has received and continues to receive handsome compensation for his role as a director of the Board as described above. In addition, he signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Ricks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.   Additional reasons that demand on Defendant Rosensweig is futile follow. Defendant Rosensweig has served as Company director since 2009. Defendant Ricks also serves as a member of the Governance and Sustainability Committee. Defendant Rosensweig has received and continues to receive handsome compensation for his role as a director of the Board as described above. In addition, he signed, and thus personally made, the false and misleading statements contained in the 2021 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons,

too, Defendant Rosensweig breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on the Board is futile follow.

183.    Defendants Biggs, Neumann, Oberg, and Pandey (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

184.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report

known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

185.    Adobe has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Adobe any part of the damages Adobe suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

186.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

187.    The acts complained of herein constitute violations of fiduciary duties owed by Adobe's officers and directors, and these acts are incapable of ratification.

188.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Adobe. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Adobe, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

189. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Adobe to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

190. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

191. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192. The Individual Defendants, by virtue of their positions with Adobe and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Adobe and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Adobe to engage in the illegal conduct and practices

complained of herein.

193.    Plaintiff, on behalf of Adobe, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act

194.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.    The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding Adobe. Not only is Adobe now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Adobe by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase its own shares at artificially-inflated prices, damaging Adobe.

196.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

197.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Adobe not misleading.

198.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Adobe.

199.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

200.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

201.    Plaintiff, on behalf of Adobe, has no adequate remedy at law.

### THIRD CLAIM
**Against Individual Defendants for Breach of Fiduciary Duties**

202.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

203.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Adobe's business and affairs.

204.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

205.    The Individual Defendants' conduct set forth herein was due to their intentional or

reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Adobe.

206.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Adobe's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (a) Figma was establishing a leadership role in user experience design and growing its market share; (b) Adobe and Figma were in direct competition with regard to user experience design; (c) the Company's "Express" product was not an effective counter to Figma's growing market share in bringing new customers to the Company's paid offerings; (d) the Company's other offerings were failing to successfully compete with Figma on user experience design; and (e) the Company was losing market share to Figma. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

207.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to overpay by nearly $1.6 billion for repurchases of its own stock while the Company's stock price was artificially inflated due to the false and misleading representations referenced herein.

208.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

209.   In yet further breach of their fiduciary duties, during the Relevant Period, one of the Individual Defendant's engaged in lucrative insider sales, netting proceeds of *over $24 million*, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

210.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

211.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

212.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

213.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Adobe has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.    Plaintiff, on behalf of Adobe, has no adequate remedy at law.

### FOURTH CLAIM
### Against Individual Defendants for Unjust Enrichment

215.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Adobe.

217.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Adobe that was tied to the performance or artificially-inflated valuation of Adobe or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

218.    Plaintiff, as a shareholder and a representative of Adobe, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

219.    Plaintiff, on behalf of Adobe, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Abuse of Control

220.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

221.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Adobe, for which they are legally responsible.

222.    As a direct and proximate result of the Individual Defendants' abuse of control, Adobe has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Adobe has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

223.    Plaintiff, on behalf of Adobe, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

224.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

225.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

226.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

227.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

228.     Plaintiff, on behalf of Adobe, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

229.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

230.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Adobe in a manner consistent with the operations of a publicly-held corporation.

231.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Adobe has sustained and will continue to sustain significant damages.

232.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

233.     Plaintiff, on behalf of Adobe, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Defendants Narayen, Murphy, Durn, David Wadhwani, and Vaas for Contribution Under Sections 10(b) and 21D of the Exchange Act

234.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

235.     Adobe and Defendants Narayen, Murphy, Durn, Wadhwani, and Vaas are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to

Defendants Narayen, Murphy, Durn, Wadhwani, and Vaas's willful and/or reckless violations of their obligations as officers and/or directors of Adobe.

236.    Defendants Narayen, Murphy, Durn, Wadhwani, and Vaas, because of their positions of control and authority as officers and/or directors of Adobe, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Adobe, including the wrongful acts complained of herein and in the Securities Class Action.

237.    Accordingly, Defendants Narayen, Murphy, Durn, Wadhwani, and Vaas are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

238.    As such, Adobe is entitled to receive all appropriate contribution or indemnification from Defendants Narayen, Murphy, Durn, Wadhwani, and Vaas.

<b><u>PRAYER FOR RELIEF</u></b>

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Adobe, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Adobe;

(c)    Determining and awarding to Adobe the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Adobe and the Individual Defendants to take all necessary actions

to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Adobe and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of Adobe to nominate at least six candidates for election to the Board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Adobe restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.


Dated: January 29, 2024


Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
          shashmi@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
eitank@bgandg.com

*Counsel for Plaintiff*

## **<u>VERIFICATION</u>**

I, Anand Roy, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29th day of January, 2024.

DocuSigned by:

*Anand Roy*

241669D16B9A4F5...

Anand Roy